### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **STACEY GRIFFIN,** *et al.* ) | **Case No. 2:22-CV-3694** |
| ) | **c/w No. 2:22-CV-3826** |
| ) | |
| **Plaintiffs,** ) | **This document applies to 2:22-CV-3826** |
| ) | |
| **v.** ) | **SECT. P(1)** |
| ) | |
| **THE UNITED STATES OF AMERICA,** ) | **JUDGE PAPILLION** |
| ) | |
| **Defendant.** ) | **MAG. JUDGE VAN MEERVELD** |
| ) | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO PLAINTIFF KIMBERLY WILLIAMS' MOTION TO EXCLUDE TESTIMONY OF JAMES "JAY" BARTHELME**

Defendant, the United States of America, respectfully submits this memorandum in opposition to the *Daubert* motion filed by one of the plaintiffs in these consolidated actions, Kimberly Williams.  Rec. Doc. 66.  In that motion, Williams asks the Court to exclude the testimony of the United States' marine accident reconstruction expert, James "Jay" Barthelme. But her arguments for doing so consist principally of red herrings, straw men, and misrepresentations (including a baseless accusation that Mr. Barthelme misrepresented the facts). Her *Daubert* motion thus should be denied.

### BACKGROUND

Mr. Barthelme is a certified and experienced marine accident investigator.  *See* Ex. 1, Barthelme CV.  Among other things, he holds a certificate from the National Association of Boating Law Administrators, after successfully completing a 36-hour class on "Comprehensive Boating Accident Investigation" that "all boating law enforcement takes to investigate and write their reports for boating accidents."  *Id.* at 3; Rec. Doc. 66-4, Barthelme Dep. Tr., at 84:7–23.  Mr. Barthelme also holds a Boat Crew Qualification with the U.S. Coast Guard Auxiliary.  Ex. 1 at 4; Rec. Doc. 66-4 at 84:7–11.  Obtaining that qualification required him to complete Coast Guard

training "as far as boat handling, and boat characteristics, and operating many different types of boats." Rec. Doc. 66-4 at 84:7–11. He has written over 30 reports over the past 20 years concerning marine accident reconstruction. *Id.* at 83:24–25. Half of those involved accidents along a river. *See id*. at 84:1–3. Mr. Barthelme has served as a presenter and instructor concerning marine accident reconstruction, and is a member of several accident reconstruction and investigation associations. Ex. 1 at 4. He has previously been qualified by a court to testify as a marine accident reconstruction expert. *See id*. at 86:1–7.

Based on his years of "knowledge, skill, experience, training, or education" concerning marine accident investigation, Fed. R. Evid. 702, Mr. Barthelme is well-qualified to provide expert testimony in this case about: (1) the operation and limitations of a "duck boat" with a unique "surface drive engine," of the sort that was involved in the accident at issue in this case; and (2) the decedents' failure to follow safe boating practices despite being experienced boaters. In particular, Mr. Barthelme will explain how Mr. Newby's duck boat had very limited power and maneuverability given the surface drive engine that was used to propel the boat, that is specifically designed for very shallow water, that has no reverse or neutral, and that underperforms when in deeper water. *See* Ex. 2, Barthelme Report, at 16. He will further testify these limitations were exacerbated by several factors, such as the boat being over its recommended weight capacity and the decedents taking the boat into the deeper water of the Pearl River. *Id*. Compounding the limitations of Mr. Newby's boat and engine are the decedents' imprudent decisions to: launch an untested boat in an unfamiliar body of water at or near sunset; not research the unfamiliar area to learn about potential hazards; enter the Pearl River rather than stay in the navigation canal, which was a perfectly safe and appropriate place to test out the boat; forego life jackets; and, most importantly, ignore visible Danger signs or not keep a proper lookout. *Id*. at 14–17.

As part of his investigation, Mr. Barthelme retraced the decedents' path into the Pearl River at the exact same time of day as when the decedents would have entered the river. During his site visit to the Pool's Bluff area, Mr. Barthelme (with an assistant) launched a boat at the Pool's Bluff boat ramp, then navigated up the canal and into the Pearl River approximately 10 to 15 minutes before sunset. *Id*. at 13. As he did so, Mr. Barthelme made a video recording with his camera pointed forwards. The video clearly shows that immediately upon entering the river, the large, red "Danger" sign on the opposite bank is visible against the dark green foliage. *See id.* at 14. Mr. Barthelme's boat then proceeded approximately halfway across the river. Rec. Doc. 66-4 at 82:23–83:4. Mr. Barthelme testified that, when he was in the middle of the river, he could read the words on the left descending bank "Danger" sign. *Id*. at 86:20–87:6. Mr. Barthelme's video recording and testimony thus will provide some key evidence concerning the decedents' failure to heed the visible Danger sign.

More generally, the two main subjects of Mr. Barthelme's testimony—the operation of Mr. Newby's boat under the circumstances as they existed at the time of the accident, combined with the decedents' failure to follow safe boating practices—are directly relevant to the Court's decision on liability (and, if necessary, comparative fault). They are also proper subjects for expert testimony, and Mr. Barthelme is eminently qualified to provide that expert testimony.

## ANALYSIS

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 588 (1992). In *Daubert*, the Supreme Court held that Rule 702 "requires the district court to act as a gatekeeper to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Metrejean v. REC Marine Logistics, LLC*, No. 08-5049, 2009 WL 3062622, at *1 (E.D. La. Sept. 21, 2009) (quoting *Daubert,*

509 U.S. at 589).  This gatekeeping function applies to all forms of expert testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court's gatekeeping function consists of a two-part inquiry into reliability and relevance.  First, the Court must determine whether the proffered expert testimony is reliable.  The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid.  *See Daubert*, 509 U.S. at 593.

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case, and whether it will assist the trier of fact to understand the evidence.  In other words, it must determine whether it is relevant.  *See id.* at 591.  "With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant 'not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.'"  *Shawler v. Ergson Asphalt & Emulsions, Inc.*, No. 15-2599, 2016 WL 1019121 at *4, (E.D. La. Mar. 15, 2016) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).

In her motion, Williams appears to challenge Mr. Barthelme's qualifications, as well as the reliability and relevance of his expert testimony.  She is wrong on all three counts.

## I.    Mr. Barthelme Is Qualified to Testify About Marine Accident Investigations

In cursory and misleading fashion, Williams suggests Mr. Barthelme is not qualified to provide expert testimony on marine accident investigations.  Rec. Doc. 66-1 at 3.  This part of her motion merits little attention.

Williams first says that a "brief look at Mr. Barthelme's résumé shows that his expertise, if any, is in the area of vehicular accident investigation."  *Id*.  Had Williams herself even briefly looked at his résumé, she would have seen that 6 out of the 12 licenses, certificates, and

accreditations he lists are related to marine accident investigation. Ex. 1 at 3. She also would have noticed several other courses he has completed on marine accident investigation in the "Academic Background" section of his CV, some of which he testified about during his deposition. *Id*. at 3–4; Rec. Doc. 66-4 at 84:7–23. And she would have realized that Mr. Barthelme has been both a presenter and instructor on subjects related to marine accident reconstruction. Ex. 1 at 3–4. Furthermore, Williams conveniently ignores his testimony that he has written some 30 reports over the past 20 years concerning marine accident investigations. Rec. Doc. 66-4 at 83:24–25; *see Van Winkle v. Rogers*, No. 22-30638, 2023 WL 5994138, at *6 (5th Cir. Sept. 15, 2023) ("Experience alone can provide a sufficient foundation for expert testimony.") (citing Advisory Committee Notes on 2000 Amendments to Rule 702).

Williams separately notes that Mr. Barthelme "does not have an engineering degree and has no background in hydrology." Rec. Doc. at 3. That may be true, but it is irrelevant. Neither of those things is a prerequisite to being an expert in marine accident investigations. A similar red herring is Williams' comment that Mr. Barthelme lacks "expertise in reconstructing accidents involving low sill dams or hydraulic rollers" specifically. *Id*. The purpose and relevance of Mr. Barthelme's investigation pertain to what happened *leading up* to the decedents going over the Pool's Bluff sill. Expertise in sills or hydraulic rollers is simply not necessary for Mr. Barthelme to be qualified to testify about the limitations of Mr. Newby's boat and the decedents' failure to follow safe boating practices.[1]

"An expert need only possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of her testimony." *Collins v. Benton*, 470

---

[1] Williams makes a few other comments in the "Qualifications" section of her *Daubert* motion, but those all concern the reliability and relevance prongs of the *Daubert* test. Rec. Doc. 66-1 at 3. We therefore address those below.

F. Supp. 3d 596, 603 (E.D. La. 2020) (internal quotations and citation omitted). As demonstrated by his deposition testimony and CV, Mr. Barthelme easily passes that threshold and is qualified to provide expert testimony in the field of marine accident investigations and reconstructions. *See, e.g., Thomas v. Chambers*, No. 18-4373, 2019 WL 1670745, at *3 (E.D. La. Apr. 17, 2019) (finding witness was qualified to provide expert opinions in field of accident reconstruction); *Sandlin v. Urbina*, No. 19-556, 2022 WL 636677, at *4 (M.D. La. Mar. 4, 2022) (same).

## II.    Mr. Barthelme's Opinions Are Both Reliable and Relevant

The rest of Williams' brief is a mishmash that confuses the reliability and relevance prongs of the *Daubert* test. Rec. Doc. at 3–12. We do our best in the following discussion to deconstruct her arguments and rebut them in an orderly way.

### A.    Reliability

In questioning the reliability of Mr. Barthelme's opinions, Williams makes much of his supposed failure to note that "Michael Golden drowned at the Pools Bluff dam on September 27, 2020." Rec. Doc. 66-1 at 7. She even suggests that either counsel for the United States withheld that information or Mr. Barthelme "misrepresented the facts." *Id*. Williams or her attorneys would do well to check their facts first. Had they done so, they would have learned that the plaintiff in *Golden v. United States*, No. 22-2534 (E.D. La.), originally misidentified the sill where Mr. Golden drown, and that it was actually at a different dam, the Bogue Chitto sill—a fact which is explained on the record in that case. *See Golden* Rec. Doc. 28-2 at 2.

Williams likewise thinks it is fatal to the reliability of Mr. Barthelme's opinions that he either was not given or "ditched" certain "before and after" photos taken by the U.S. Army Corps of Engineers ("Corps") a few days after the accident, so that he could "arrive at a predetermined conclusion." Rec. Doc. 66-1 at 8. Not even close. First, those photos are listed in his report among the documents he considered. Ex. 2 at 2 (US2644–2654). Second, the Corps' "before"

photos of the left descending bank sign were taken from a boat positioned upriver of the sign and very close to the left descending bank itself, while its "before" photos of the right descending bank were taken as the Corps employee was standing on the shore of that bank. Rec. Doc. 66-3. But there is *zero* evidence that the decedents in this case approached the signs from any of those angles or directions. On that point, the only thing known with reasonable certainty—and which no party disputes—is that the decedents entered the Pearl River from the navigation canal. From *that* vantage point, there is indisputable evidence that the left descending bank sign was clear of vegetation and would have been in the decedents' line of sight. That evidence is, once again, the photo and video taken by Williams herself the day after the accident, the latter of which is featured in Mr. Barthelme's report. Ex. 2 at 15. In short, it would be pure speculation to assume the photos taken on December 2, 2021, depict what the decedents would have seen, as opposed to Williams' photo taken on November 30, 2021, which *actually* depicts what they would have seen. If anything, therefore, Mr. Barthelme's reliance on the latter confirms the reliability of his opinions.

Next, Williams complains about a few minor and ultimately irrelevant calculations: how often a hydraulic roller is present at the Pool's Bluff sill, and the water velocity at the time of Mr. Barthelme's site visit. *See* Rec. Doc. 66-1 at 10. Neither of these calculations matter. The United States does not dispute that a hydraulic roller was present on the day of the accident, and the water velocity at the time of Mr. Barthelme's site visit has no bearing on his opinions.

Williams also points out that one of her experts, Karl Kingery, disagrees with Mr. Barthelme's opinion that "the location of the sunken vessel indicates that Mr. Newby piloted the vessel across the river . . . before going over the dam." *See id.* at 10–11. A disagreement among experts, however, is just that; it is hardly proof that one expert is unreliable. Indeed, in the very next sentence of her brief, she says that, according to Mr. Kingery, "Mr. Newby's boat *could* have

7

been deposited there from any point at which he went over the dam," effectively conceding that Mr. Barthelme's opinion is just as plausible. *Id*. at 11 (emphasis added).

Elsewhere in her brief Williams lists several items in bullet points that are also apparently meant to show the unreliability of Mr. Barthelme's opinions. Rec. Doc. 66-1 at 5–6. They do not. To the extent not addressed above, these can be easily refuted in similar, rapid-fire succession.

- "The limit of his opinion with respect to the operation of the vessel is that a prudent operator should keep a look out." This statement misrepresents Mr. Barthelme's deposition testimony. As reflected in the same page of the deposition transcript that Williams cites, the question preceding this answer was narrowly focused on Mr. Barthelme's opinion about "rules of the road" that apply to the operation of a vessel. Rec. Doc. 66-4 at 21:23–22:8.

- Various criticisms concerning Mr. Barthelme's estimates of the capacity of the boat. Because the boat has not been recovered, Mr. Barthelme reasonably estimated the capacity of the boat based on information known about the boat, standard calculations for weight capacity, and the manufacturer's published capacities for similar boats. Ex. 2 at 3. Even with the most conservative estimate, the total weight in the boat at the time of the accident exceeded the boat's capacity. Rec. Doc. 66-4 at 37:10–12.

- Mr. Barthelme has "no opinion on the size of the lettering on the signs" or "whether the signs were properly placed." This is generally true but irrelevant to his opinions. Although Mr. Barthelme is not an expert on the Corps' signage design and placement, he determined from his site visit that the left descending bank sign is visible to boaters entering the river from the canal, and the words on the sign can be read from the middle of the river. Ex. 2 at 5–6, 13–14; Rec. Doc. 66-4 at 86:20–87:6.

- Mr. Barthelme operates his boat at night and "there is no restriction to launching at Pool's Bluff at night." Again, both things may be true but they in no way cast doubt on Mr. Barthelme's opinions. First, there is no evidence the decedents had any kind of flashlight or spotlight with them on the boat. Second, the fact remains it was not prudent for the decedents to launch an untested boat for the very first time in an unfamiliar body of water near sunset without researching the area to learn about potential hazards.

- Mr. Barthelme admitted "the accident itself is not a part of my report." Williams once again pulls Mr. Barthelme's deposition testimony completely out of context. As the transcript makes clear, Mr. Barthelme was responding to a question about whether he typically reviews "damage to the boat and witness testimony" when investigating a marine accident. Rec. Doc. 66-4 at 87:25–88:5. So when he said "the accident itself" is not part of his report, Mr. Barthelme was merely acknowledging the obvious fact that such "damage to the boat and witness testimony" are not available in this case.

That last point bears further discussion. Williams says that Mr. Barthelme "admits that his report is based on speculation as to what occurred." Rec. Doc. 66-1 at 5. For this supposed "admission," Williams cites the following passage in Mr. Barthelme's deposition:

Q: So you didn't do an accident reconstruction?
A: Well, I mean there was – there's an investigation as to why this accident may have happened.
Q: May have happened. *It's just basically speculation as to what occurred, true*?
A: *Well, for everybody because there are no witnesses*.
Q: And there's no evidence.
MR. WHITMAN: Object to form.
Q: (BY MR. GAMBEL): True?
A: We don't have the boat. We don't have that, no, sir.

Rec. Doc. 66-4 at 35:3–14 (emphasis added). The italicized language is key because Williams' concern about speculation goes both ways, even more so for the plaintiffs.

It is hornbook law that the plaintiff in a maritime negligence suit bears the burden to prove "negligence and causation by a preponderance of the evidence." *Marquette Transp. Co. v. Louisiana Mach. Co.*, 367 F.3d 398, 402 (5th Cir. 2004). Here, though, Williams' own counsel essentially concedes the plaintiffs cannot meet that burden because "it's just basically speculation as to what occurred." At the most basic level, that is absolutely correct.

As Mr. Barthelme astutely observed, determining the cause of the accident depends on speculation "for everybody because there are no witnesses." That means there is no eyewitness testimony or other evidence in this case for the plaintiffs to show it's more likely than not that any alleged negligence by the government in maintaining the Danger signs was a "substantial factor" in causing the accident. *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992). It is just as possible, and more likely, the decedents saw the Danger sign and ignored it. It's equally possible, if not likely, they didn't pay any attention to the sign even though it was in their line of sight and not obscured by vegetation from their vantage point. Ex. 2 at 13–17. Or it's possible the decedents had engine trouble while on the river—just as Williams' own expert

9

and attorneys did as they were conducting their own site visit.  Rec. Doc. 74 at 7–9.  With nothing but "speculation as to what occurred," the plaintiffs cannot meet their burden of establishing causation by a preponderance of the evidence.

Thus, if Williams genuinely believes that Mr. Barthelme's opinions are unreliable because they are based on speculation, then her case (and the other case in these consolidated matters) must be dismissed for the exact same reason.  Conversely, if the plaintiffs are allowed to put on a case with the evidence that's available, then Mr. Barthelme is equally entitled to rely on that same evidence to form his expert opinions.

Speaking of which, Rule 702 requires only that an expert's opinion be "based on sufficient facts or data" and be "the product of reliable principles and methods."  Fed. R. Evid. 702(b).  Mr. Barthelme formed his opinions in this case by relying on the same kind of facts and data that accident investigators and reconstructionists typically use, including a site inspection, as well as a review of police reports, photographic evidence, deposition testimony, and other relevant documentary evidence.  Ex. 2 at 2–3.  Based on that evidence and his years of experience, training, and knowledge, Mr. Barthelme formed opinions about the various factors that likely contributed to the accident in this case and set out those opinions in sufficient detail.  *See id*. at 3–17.  Courts routinely deny *Daubert* motions seeking to exclude accident reconstruction experts in similar circumstances, and this Court should do the same here.  *See*, *e.g.*, *Thomas*, 2019 WL 1670745 at *4 (collecting cases); *Sandlin*, 2022 WL 636677 at *4–5 (collecting cases).

**B.      Relevance**

Williams' argument that Mr. Barthelme's testimony would not be relevant or helpful boils down to her comment that his opinions are within the "common knowledge of a lay jury or of this Court."  Rec. Doc. 66-1 at 9.  Even a cursory review of his report belies that contention.

10

First, how a duck boat with a unique surface drive engine that is designed specifically for use in shallow water would operate and maneuver in the deeper water of the Pearl River, especially when overloaded, is hardly a matter that is "common knowledge." Ex. 2 at 3, 14–17. But it *is* something within Mr. Barthelme's expertise based on his years of experience, training, and skill in "boat handling, and boat characteristics, and operating many different types of boats." Rec. Doc. 66-4 at 84:7–11. Second, the "rules of the road" and other practices and procedures that a reasonably prudent boater should follow when on the water are likewise not within a typical juror's or jurist's common knowledge. Ex. 2 at 14–17. But again, they are squarely in Mr. Barthelme's wheelhouse. Tellingly, Williams does not argue Mr. Barthelme's testimony about these two subjects are irrelevant to the Court's decision in this matter—because they obviously are relevant. The Court therefore should find that Mr. Barthelme's proposed testimony is both relevant and helpful. *See*, *e.g.*, *Schmolke v. Walmart, Inc.*, No. 21-2278, 2022 WL 4016733, at *2 (E.D. La. Sept. 2, 2022) (denying *Daubert* motion to exclude safety expert in part because issue of whether defendant's "procedures conformed with industry standards is disputed in this matter, and industry standards for spill-containment and similar procedures are not within the knowledge of the average juror"); *Matter of Tara Crosby, LLC*, 603 F. Supp. 3d 305, 309 (E.D. La. 2022) (same, as to marine safety expert).

## CONCLUSION

For the reasons stated above, the Court should deny Williams' motion to exclude the testimony of Mr. Barthelme.

11

Respectfully submitted this 10th day of October 2023,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

JESSICA G. SULLIVAN (LA Bar No. 27633)
Senior Trial Counsel

/s/ *James R. Whitman*
JAMES R. WHITMAN (D.C. Bar No. 987694)

Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, DC 20044-4271
Tel:     (202) 616-4169
Fax:     (202) 616-4314
E-mail:  james.whitman@usdoj.gov

*Attorneys for the United States*

12